**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Robert Bowling, | No. CIV 12-035-TUC-LAB |
| Plaintiff, | **ORDER** |
| vs. | |
| Carolyn W. Colvin, Commissioner, Social Security Administration, | |
| Defendant. | |

The plaintiff filed this action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  The Magistrate Judge presides over this case pursuant to 28 U.S.C. § 636(c) having received the written consent of both parties.  *See* FED.R.CIV.P. 73; (Doc. 10).

The court finds the final decision of the Commissioner is supported by substantial evidence and is free from legal error.

PROCEDURAL HISTORY

On July 17, 2008, Bowling constructively filed an application for supplemental security income.  (Tr. 35, 205)  His application for disability insurance benefits was filed shortly

afterwards on July 24, 2008.  *Id*.  He alleged disability beginning on March 31, 2002[1], due to "paranoid schizophrenia, depression, methamphetamine addiction, Hepatitis C, back injury, head injury, . . . [and] hallucinations . . . ."  (Tr. 35, 232)   His claim was denied initially (Tr. 142-49) and upon reconsideration (Tr. 152-58).  Bowling requested review and appeared with counsel at a hearing before Administrative Law Judge (ALJ) George W. Reyes on June 18, 2010. (Tr. 35-48)  In his decision, dated December 14, 2010, the ALJ found Bowling was not disabled.  *Id*.

Bowling appealed and submitted additional exhibits, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 1-6); *Bass v. Social Sec. Admin.*, 872 F.2d 832, 833 (9th Cir. 1989).  Bowling subsequently filed this action appealing the Commissioner's final decision.  (Doc. 1); *see* 20 C.F.R. § 422.210(a).  He filed his opening brief on October 9, 2012.  (Doc. 18)  The Commissioner filed a responsive brief on October 30, 2012.  (Doc. 19)  Bowling filed a reply on December 17, 2012.  (Doc. 22)

Claimant's Work History and Medical History

In the ten years prior to his alleged disability onset, Bowling worked as a delivery driver, a laborer, a car mechanic, and a home window installer.  (Tr. 233) He states he is now unable to work because of back pain and mental health problems.  (Tr. 232) He has problems concentrating due to auditory and visual hallucinations.  *Id*.  His depression and hepatitis C cause him to be fatigued.  *Id*.

In 1997, Bowling was in a car accident and suffered severe head trauma.  (Tr. 465) He believes his subsequent mental health problems might be the result of this injury.  (Tr. 573, 576)

In September of 2003, Bowling was treated for one week at the Gila Regional Medical Center, Silver City, NM for psychiatric distress.  (Tr. 400) His discharge diagnosis reads: "Axis I: 1. Major depression, moderate to severe, improved with medication and cognitive-behavioral psychotherapy and group psycho-social therapy treatment. 2. Amphetamine dependence with

---

[1]  Bowling's alleged onset date was later amended to September 7, 2003.  (Tr. 35, 73)

1   psychotic behavior.  3.  History of alcohol dependence, allegedly in remission.  Axis II:

2   Deferred.  Patient gives multiple mixed personality traits that need[] to be reevaluated and

3   ongoing psychiatric evaluation and treatment as needed and reassessed in three months.  Axis

4   III: Positive reaction test for hepatitis C. . . . Axis IV: 1, 2, 3, 4, 5 and 6 severe.  Axis V: 40.  On

5   admission 25 to 30.  Past year unknown." (Tr. 400)  The discharge summary report explains

6   that Bowling refused to stay any longer and "demanded to be discharged." (Tr. 400) The report

7   further states that "it would have been good if he could stay for another week," but "[w]e do not

8   have any reason to do a court hold at this point." (Tr. 400)

9        In October of 2003, Bowling received treatment from Border Area Mental Health

10   Services, Inc. for anxiety and depression.  (Tr. 326) He was diagnosed with Mood Disorder

11   NOS and Amphetamine Dependence.  (Tr. 324) He was prescribed Prozac and Zyprexa.  (Tr.

12   352)  The medical record contains references to Bowling's failure to keep appointments.  (Tr.

13   335, 345, 346, 348, 638, 662, 663, 664, 665)   His case was eventually closed due to

14   noncompliance.  (Tr. 638)

15        In April and May of 2007, Bowling received court-ordered inpatient treatment for

16   methamphetamine dependence from the New Mexico Rehabilitation Center in Roswell, NM in

17   connection with a plea to a charge of domestic violence assault.  (Tr. 38, 96, 458)  His discharge

18   diagnosis reads: "1.  Methamphetamine dependence  2.  Cannabis dependence  3.  Nicotine

19   dependence  4.  Alcohol abuse  5.  Gastroesophageal reflux disease." (Tr. 458)

20        In February of 2008, Bowling was treated for acute back pain caused by lifting his

21   girlfriend's grandchild.  (Tr. 502) A CT scan found "no evidence of herniated nucleus

22   pulposus." (Tr. 504)  The physician's impression was "acute lumbar strain." (Tr. 503)

23        In December of 2008, Bowling was examined by Noelle Rohen, Ph.D., for the state

24   disability determination service.  (Tr. 541) Rohen gave the following diagnostic impression:

25   "Axis I: Psychotic Disorder NOS; Mood disorder NOS; Methamphetamine Dependence in

26   Sustained Full Remission per claimant;  Axis II: 799.9 Diagnosis Deferred; antisocial features;

27   Axis III: Defer to medical records." (Tr. 544)  She found Bowling "appear[ed] neither anxious,

28   nor agitated, nor actively psychotic, nor particularly impaired by medication side effects." *Id*.

1  She did find "objectively evident" of the "claimant's antisociality." *Id.* Rohen found Bowling

2  was not capable of managing benefits on his own behalf "given questionable remission of

3  substance dependence." *Id.*

4        In November of 2008, Vivienne J. Kattapong, M.D., reviewed the medical record for the

5  state disability determination service. (Tr. 540) She noted that although Bowling has a history

6  of hepatitis C, his liver function tests are normal. *Id.* His lumbar spinal x-rays are also normal.

7  *Id.* Kattapong concluded that Bowling had no medically determinable physical ailments that

8  would be expected to last 12 months. *Id.*

9        In December of 2008, Randall J. Garland, Ph.D., reviewed the medical record for the

10 state disability determination service and completed a Psychiatric Review Technique form. (Tr.

11 550) He documented "(1) Schizophrenic, Paranoid and Other Psychotic Disorders (Psychotic

12 Disorder NOS), (2) Affective Disorders (Mood Disorder, NOS) and (2) Substance Addiction

13 Disorders (Methamphetamine Dependence in sustained full remission per cl.)." (Tr. 550, 552,

14 553, 558) He found mild limitation in "Activities of Daily Living" and "Maintaining Social

15 Functioning." (Tr. 560) He found moderate limitation in "Maintaining Concentration,

16 Persistence or Pace." (Tr. 560)

17       Garland also completed a Mental Residual Functional Capacity Assessment. (Tr. 547)

18 He found moderate limitation in Bowling's "ability to understand and remember detailed

19 instructions" and "ability to carry out detailed instructions." (Tr. 546-49)

20       In April of 2009, Samantha Fierro, submitted a Third Party Function Report describing

21 Bowling's impairments. (Tr. 286-93) She indicated that Bowling can prepare his own meals

22 and perform simple household tasks. (Tr. 288) He can drive a car, but he does not venture out

23 alone because he gets confused. (Tr. 289) She summarized his condition as follows: "Mr.

24 Bowling has a severe problem with anxiety and hearing voices, he has trouble getting along

25 with others. He gets extremely confused and [is] not very good at follow[ing] directions and

26 understanding." (Tr. 293)

27

28

In April of 2009, Bowling was evaluated by La Frontera Center, Inc.  (Tr. 702) He was diagnosed with bipolar disorder, generalized anxiety disorder, and panic disorder with agoraphobia.  (Tr. 705)   He was prescribed risperdone and lorazepam.  *Id.*

In May of 2009, Andres Kerns, Ph.D., reviewed the medical record for the state disability determination service and affirmed the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment previously submitted by Garland.  (Tr. 550)

In June of 2010, Jane Ackerly, MSN, PMHMP-BC, wrote a letter summarizing Bowling's condition.  (Tr. 764) She stated that Bowling "has been unable to work due to psychiatric symptoms involving severe anxiety and panic." *Id.*

On June 18, 2010, Bowling appeared with counsel at a hearing before ALJ George W. Reyes.  (Tr. 68)  At the time of the hearing, Bowling was 41 years old.  (Tr. 125) He has a 7th grade education.  (Tr. 122)

Bowling testified that he lost his job in 2001 due to mental health issues.  (Tr. 74) He claimed that he is unable to work due to auditory hallucinations, visual hallucinations, bipolar mood swings, agoraphobia, anxiety, and panic attacks.  (Tr. 74, 79)

He testified that he sometimes goes to the movies with his girlfriend, but he has to take extra medication to avoid panic attacks.  (Tr. 102) The previous Saturday, they had a barbecue and Bowling cooked meat on the grill.  *Id.*

Bowling's girlfriend, Norma Magdaleno, testified that she has known Bowling since 2005 and has lived with him since 2007.  (Tr. 106-07, 279)  She testified that Bowling has poor short-term memory and needs constant direction. (Tr. 107)   His medication dampens his aggressive outbursts and irritability, but it produces a blunted affect and interferes with his ability to converse with people.  (Tr. 108)  In public, he suffers from anxiety and "kind of gets frozen."  (Tr. 114)

A vocational expert, Tracy Young, gave testimony about Bowling's previous jobs.  (Tr. 116, 117-19)  She opined that a person who is limited to simple, routine, repetitive tasks in a low pressure environment, who could tolerate only occasional conversations with supervisors and co-workers, and who could concentrate for only two hours at a time could not perform any

1  of Bowling's past relevant work.  (Tr. 120, 121)  Such a person could, however, work as a night

2  office cleaner, DOT # 323.687-014, or as a landscape laborer, DOT # 406.687-010.  (Tr. 126)

3  Such a person could not work if he was subject to panic attacks lasting 20 minutes per day.  (Tr.

4  128)  In other words, if a person was off-task five percent of the time, he could not maintain

5  employment. (Tr. 133)  Also, a person who could not have at least occasional communication

6  with his supervisors could not maintain employment.  (Tr. 135)

7          In his decision, dated December 14, 2010, the ALJ found Bowling was not disabled.  (Tr.

8  35-48)

9          In April of 2011, Bowling was evaluated at the Disability Assessment Clinic by David

10 Wayne Smith, D.ED., DABPS, FACFEI. (Tr. 774-75)  Smith found Bowling to have a normal

11 IQ in the middle of the average range.  *Id.*  He displayed, however, extremely poor short-term

12 memory being unable to recall anything about a paragraph that was read to him.  *Id.*  Smith

13 concluded that Bowling was "severely mentally ill."  *Id.*  He opined as follows: "This man

14 would not be a candidate for employment, in fact, he could be at risk in any job due to his

15 memory and concentration, as well as his auditory and visual hallucinations.  I did not have a

16 record of psychiatric treatment, only the patient's record of his medications.  I also have some

17 concerns as to whether he is capable of determining what medications to take and when.  It

18 would be in his best interest to have a guardian appointed, including a person to manage any

19 money he receives from SSDI."  *Id.*

20         In June of 2011,  Bowling was admitted to Palo Verde Hospital with suicidal thoughts

21 and auditory command hallucinations.  (Tr. 781)    He was treated with Zyprexa, which he

22 responded to better than the Risperdal, his current medication.  *Id.*  His condition improved, and

23 he felt safe to go home.  *Id.*  At discharge, he was assessed as follows: "Axis I  Mood disorder;

24 NOS.  History of being diagnosed with bipolar disorder with psychotic features.  History of

25 methamphetamine abuse, in remission.  Axis II  Deferred.  Axis III  As in past medical history.

26 Axis IV  Moderate Stressors.  Axis V  GAF of 30-40."  (Tr. 784)

27

28

1

CLAIM EVALUATION

2          Social Security Administration (SSA) regulations require that disability claims be

3   evaluated pursuant to a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920; *Baxter*

4   *v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of

5   whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4),

6   416.920(a)(4). If so, then the claimant is not disabled, and benefits are denied. *Id.*

7          If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two

8   which requires a determination of whether the claimant has a "medically severe impairment or

9   combination of impairments." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In making a

10  determination at step two, the ALJ uses medical evidence to consider whether the claimant's

11  impairment more than minimally limits or restricts his or her "physical or mental ability to do

12  basic work activities." *Id.* If the ALJ concludes the impairment is not severe, the claim is

13  denied. *Id.*

14         Upon a finding of severity, the ALJ proceeds to step three which requires a determination

15  of whether the impairment meets or equals one of several listed impairments that the

16  Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R.

17  §§ 404.1520(a)(4), 416.920(a)(4); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's

18  impairment meets or equals one of the listed impairments, then the claimant is presumed to be

19  disabled, and no further inquiry is necessary. *Ramirez v Shalala,* 8 F.3d 1449, 1452 (9th Cir.

20  1993). If the claimant's impairment does not meet or equal a listed impairment, evaluation

21  proceeds to the next step.

22         The fourth step requires the ALJ to consider whether the claimant has sufficient residual

23  functional capacity[2] (RFC) to perform past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

24  If yes, then the claim is denied. *Id.* If the claimant cannot perform any past work, then the ALJ

25  must move to the fifth step which requires consideration of the claimant's RFC to perform other

26

27

28         [2] Residual functional capacity is defined as that which an individual can still do despite his or
her limitations. 20 C.F.R. §§ 404.1545, 416.945.

1   substantial gainful work in the national economy in view of claimant's age, education, and work

2   experience.  20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

3       In determining whether the claimant retains the ability to perform other work, the ALJ

4   may refer to the Medical Vocational Guidelines ("the grids") promulgated by the SSA.  *See* 20

5   C.F.R. Pt. 404, Subpt. P, App.2;  *Desrosiers v. Secretary of Health and Human Services,* 846

6   F.2d 573, 576-577 (9th Cir. 1988).   The grids categorize jobs according to their exertional

7   requirements such as sedentary work, light work, or medium work.  *Tackett v. Apfel*, 180 F.3d

8   1094, 1101 (9th Cir. 1999).  The grids calculate whether or not the claimant is disabled based

9   on the claimant's exertional ability, age, education, and work experience.  *Id.*  The grids are a

10  valid basis for denying claims where they completely and accurately describe the claimant's

11  abilities and limitations.  *Id.* at 1101-02.  If the claimant has only exertional limitations, the

12  claim may be resolved based only on the grids.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1115

13  (9th Cir. 2006).

14      If the claimant has significant non-exertional limitations, the grids do not apply.  *Penny*

15  *v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir.1993).  "Non-exertional limitations are limitations that

16  do not directly affect a claimant's strength."  *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir.

17  1988).  Mental limitations, for example, are non-exertional.  *Id.* at 1340-41.  If significant non-

18  exertional limitations prevent the claimant from performing the full range of work in any

19  exertional category, the ALJ must take the testimony of a vocational expert to deny the claim.

20  *Id.* at 1341.

21      If the claimant has both exertional and non-exertional limitations, the ALJ must consult

22  the grids first before considering the testimony of a vocational expert at step five.  *Lounsburry*

23  *v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006).  If the grids direct a finding of disability, that

24  finding must be adopted by the Commissioner.  *Lounsburry,* 468 F.3d at 1116.

25

26      The ALJ's Findings

27      At step one of the disability analysis, the ALJ found Bowling "has not engaged in

28  substantial gainful activity since March 31, 2002, the [originally] alleged onset date . . . ."  (Tr.

1   37).  At step two, he found Bowling "has the following severe impairments: psychotic disorder;

2   affective disorder; history of substance abuse disorder . . . ."  (Tr. 37).  At step three, the ALJ

3   found Bowling's impairments did not meet or equal the criteria for any impairment found in the

4   Listing of Impairments, Appendix 1, Subpart P, of 20 C.F.R., Part 404.  (Tr. 40).

5       The ALJ then analyzed Bowling's residual functional capacity (RFC).  (Tr. 41)  He

6   found Bowling "has the residual functional capacity to perform a full range of work at all

7   exertional levels but with the following nonexertional limitations: the claimant is limited to

8   simple, routine, repetitive tasks, that are not performed in a fast paced production environment

9   and involve only simple work-related decisions . . .; can respond to changes in a routine work

10  setting . . .; can be around employees throughout the workday but would have only occasional

11  conversation and interpersonal interaction with his supervisors and co-workers; would be

12  limited to only incidental public contact; [and] can attend and concentrate for two hours then

13  needs to take a break. . . ." (Tr. 41); *see* (Tr. 540, 545, 546-49, 560)

14      At step four, the ALJ found Bowling was unable to perform past relevant work.  (Tr. 46)

15  At step five, the ALJ found, using the testimony of the vocational expert, that Bowling could

16  work as a night office cleaner, DOT # 323.687-014, or as a landscape laborer, DOT # 406.687-

17  010.  (Tr. 47) Accordingly, he concluded Bowling was not disabled.  (Tr. 48)

18

19              STANDARD OF REVIEW

20      An individual is entitled to disability benefits if he or she demonstrates, through

21  medically acceptable clinical or laboratory standards, an inability to engage in substantial

22  gainful activity due to a physical or mental impairment that can be expected to last for a

23  continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  "[A]

24  claimant will be found disabled only if the impairment is so severe that, considering age,

25  education, and work experience, that person cannot engage in any other kind of substantial

26  gainful work which exists in the national economy."  *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir.

27  1993) (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

28

1    The findings of the Commissioner are meant to be conclusive.  42 U.S.C. §§ 405(g),

2    1383(c)(3).  The decision to deny benefits "should be upheld unless it contains legal error or is

3    not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

4    Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept

5    as adequate to support a conclusion."  *Id.*  It is "more than a mere scintilla but less than a

6    preponderance." *Id.*.

7        "Where evidence is susceptible to more than one rational interpretation, the ALJ's

8    decision should be upheld." *Orn*, 495 F.3d at 630.  "However, a reviewing court must consider

9    the entire record as a whole and may not affirm simply by isolating a specific quantum of

10   supporting evidence." *Id.*

11       In evaluating evidence to determine whether a claimant is disabled, the opinion of a

12   treating physician is entitled to great weight. *Ramirez v. Shalala*, 8 F.3d 1449, 1453-54 (9th Cir.

13   1993).  The Commissioner may reject a treating physician's uncontradicted opinion only if he

14   sets forth clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

15   1995).  If the treating physician's opinion is contradicted by another doctor, the Commissioner

16   may reject that opinion only if he provides specific and legitimate reasons supported by

17   substantial evidence in the record. *Lester,* 81 F.3d at 830.  No distinction is drawn "between

18   a medical opinion as to a physical condition and a medical opinion on the ultimate issue of

19   disability." *Rodriguez v. Bowen*, 876  F.2d 759, 761 n.7 (9th Cir. 1989).

20       "The opinion of an examining physician is, in turn, entitled to greater weight than the

21   opinion of a non[-]examining physician."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).

22   "[T]he Commissioner must provide 'clear and convincing' reasons for rejecting the

23   uncontradicted opinion of an examining physician." *Id.*  "[T]he opinion of an examining doctor,

24   even if contradicted by another doctor, can only be rejected for specific and legitimate reasons

25   that are supported by substantial evidence in the record." *Id.* at 830-31.

26       "Where medical reports are inconclusive, questions of credibility and resolution of

27   conflicts in the testimony are functions solely of the [Commissioner]." *Magallanes,* 881 F.2d

28   747, 751 (9th Cir. 1989) (punctuation omitted).  The Commissioner's finding that a claimant is

1  less than credible, however, must have some support in the record. *See Light v. Social Security*

2  *Administration,* 119 F.3d 789 (9th Cir. 1997).

3         The ALJ need not accept the claimant's subjective testimony of disability, but if he

4  decides to reject it, "[]he must provide specific, cogent reasons for the disbelief." *Lester,* 81

5  F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the

6  Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing."

7  *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not

8  credible and what evidence undermines the claimant's complaints." *Id.*

9

10        DISCUSSION

11        The ALJ in this case found that Bowling has severe impairments that affect his ability

12 to perform basic work activities: psychotic disorder; affective disorder; and history of substance

13 abuse disorder.  Based on the medical record, Bowling's testimony, and testimony from the lay

14 witnesses, the ALJ concluded that Bowling was limited to "simple, routine, repetitive tasks, that

15 are not performed in a fast paced production environment and involve only simple work-related

16 decisions."  (Tr. 41)  While he could be around others during the work day, he could tolerate

17 "only occasional conversation and interpersonal interaction with his supervisors and co-

18 workers." (Tr. 41) He could tolerate only limited contact with the public and could stay on-task

19 for only two hours at a stretch, although with normal breaks he could work a full eight-hour day.

20 (Tr. 41)

21        Based on the testimony of the vocational expert, the ALJ concluded that Bowling could

22 not return to his past relevant work.  (Tr. 46)  He could, however, work as a night office cleaner,

23 DOT # 323.687-014, or as a landscape laborer, DOT # 406.687-010.  (Tr. 47)  Accordingly, he

24 concluded Bowling was not disabled.  (Tr. 48)

25        The court finds the decision of the ALJ is supported by substantial evidence.  Bowling's

26 periodic hospitalizations support the ALJ's finding of severe mental impairments.  Bowling's

27 testimony and that of the lay witnesses indicate that his ability to work is limited by his short-

28 term memory problems and his difficulties coping with anxiety and panic attacks.  Nevertheless,

1    as the non-examining medical examiner, Garland, concluded, Bowling "is able to meet the basic
2    mental demands of competitive, remunerative, unskilled work on a sustained basis. . . ."  (Tr.
3    549);  *see Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating
4    or non-examining physicians may also serve as substantial evidence when the opinions are
5    consistent with independent clinical findings or other evidence in the record.").

6        The record provides support for the ALJ's RFC assessment.  *See* (Tr. 540, 541-45, 547-
7    62)  The vocational expert testified that someone with that RFC could work as a night office
8    cleaner, DOT # 323.687-014, or as a landscape laborer, DOT # 406.687-010.  (Tr. 47)
9    According, the ALJ concluded Bowling was not disabled.  (Tr. 48)  The court finds the ALJ's
10   finding of non-disability is supported by substantial evidence.  *See  Bayliss v. Barnhart*, 427
11   F.3d 1211, 1217-18 (9th Cir. 2005) (The ALJ's reliance on the testimony of a vocational expert
12   was proper where she was given a hypothetical that contained all the limitations the ALJ found
13   credible and supported by substantial evidence in the record.).

14       Bowling argues generally, that the ALJ failed to give appropriate deference to the
15   medical evidence that shows he has extensive mental impairments.  (Doc. 18, pp. 10-14)
16   According to Bowling, his cognitive problems, depression, anxiety, and auditory hallucinations
17   prevent him from working.  *Id*.  These problems, he argues, were well documented by his
18   mental health providers at Palo Verde Hospital, in New Mexico, and at La Frontera.  *Id*.  He
19   specifically notes that the consulting physician, Rohen, concluded he would not be able to
20   manage his own benefits should they be awarded.  *Id*.

21       Contrary to Bowling's arguments, the ALJ did not ignore the medical record of
22   Bowling's mental impairments.  He simply believed that those impairments did not result in
23   more than a moderate limitation in his ability to perform work-related tasks.  (Tr. 45) He made
24   this evaluation based on his analysis of the medical record, Bowling's statements, and the
25   evidence from the lay witnesses.  It does not matter if the weight of the evidence goes against
26   the ALJ's conclusions.  All that matters is that substantial evidence supports the ALJ's analysis,
27   and here it does.  *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("Substantial evidence
28   is more than a mere scintilla but less than a preponderance.").

1    It is true that the consulting psychologist, Rohen, opined that Bowling "is not capable

2   of managing benefits on his own behalf," but she did not make this statement because she

3   believed Bowling lacks the cognitive ability to manage money.  (Tr. 544)  Instead, she stated

4   that Bowling is not capable of managing benefits "*given questionable remission of substance*

5   *dependence*."  (Tr. 544) (emphasis added)  Apparently, she believed he might relapse and begin

6   using controlled substances again and for this reason, could not manage benefits on his own

7   behalf.  Rohen's statement does not contradict the ALJ's analysis.

8    It is also worth noting that other aspects of Rohen's report do not entirely support

9   Bowling's allegations of disability.   At the examination, Bowling appeared "neither anxious,

10   nor agitated, nor actively psychotic, nor particularly impaired by medication side effects." (Tr.

11   544)  Accordingly, Rohen reported that she "is able to say very little about the credibility of his

12   allegations." *Id.*  "Furthermore," she wrote, "certain aspects of his history are questionable,

13   such as his assertion that he has had to hire legal assistance to be released from inpatient

14   hospitalization, or that he has had to deny depression to be permitted to continue his interferon

15   treatment." *Id.*  She warned, "[i]t is unclear whether these represent misunderstandings or

16   deliberate misrepresentations of events."  *Id.*  The court finds the ALJ's assessment of

17   Bowling's functional impairments is not contrary to the medical evidence.

18    Bowling further argues the ALJ improperly discounted his subjective testimony of

19   disabling symptoms.   (Tr. 18, pp. 14-19)

20    The ALJ need not accept the claimant's subjective testimony of disability, but if he

21   decides to reject it, "[he] must provide specific, cogent reasons for the disbelief." *Lester,*  81

22   F.3d at 834.  "Unless there is affirmative evidence showing that the claimant is malingering, the

23   Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing."

24   *Id.*  "General findings are insufficient; rather, the ALJ must identify what testimony is not

25   credible and what evidence undermines the claimant's complaints."  *Id.*

26    The ALJ may consider at least the following factors when weighing the claimant's

27   credibility: "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony

28   or between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and

testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Thomas v. Barnhart*, 278 F.3d 947, 958 -959 (9th Cir. 2002). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id*.

In this case, the ALJ provided sufficient reasons to justify his credibility finding. First, Bowling's record of daily activities indicates his limitations are not as severe as he alleges them to be. As the ALJ noted, Bowling "reported no problems with personal care," "took care of his girlfriend's grandchildren and cared for pets." (Tr. 42) "He prepared simple meals, did light chores and yard work, drove and used public transportation, shopped infrequently, watched television, read and used a computer." (Tr. 42) In June or July of 2009, Bowling "took a trip to New Mexico and went to the mountains and lake." (Tr. 40) He "reported going to the movies" and held a barbecue at his home, although he needed to increase his medication on those occasions. (Tr. 43) Household activities are generally not performed with the same persistence and pace required in the workplace, but they may be considered by the ALJ in evaluating a claimant's subjective testimony of disability. *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d, 595, 600 (9th Cir. 1999). Here, Bowling's household activities support the ALJ's assessment of his RFC.

The ALJ took particular note of the fact that Bowling has a driver's license and continues to drive, although he states "the farthest he has driven is five or six miles from his home." (Tr. 42, 44, 97-98) "Driving distances as long as six miles requires constant focus, concentration, and maintenance of attention." *Shafer v. Astrue*, 2009 WL 840603, 9 (E.D.Cal.2009). Accordingly, the ALJ could reasonably find that Bowling's continued driving was inconsistent with his testimony that he lacks the ability to stay focused and on-task.

In addition, the ALJ noted that there are discrepancies in the medical record that "cast doubt regarding the credibility of the claimant's testimony" (Tr. 43) The medical record contains references to Bowling's "noncompliance with the medical regimen specified by his healthcare providers." (Tr. 43, 335, 345, 346, 348, 638, 662, 663, 664, 665); *see Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("We have long held that, in assessing a claimant's

- 14 -

credibility, the ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.") (punctuation modified).  The medical record also contains references to Bowling's alcohol abuse, in spite of the fact that Bowling denies he ever had a drinking problem. (Tr. 400, 458, 562)  These discrepancies cast further doubt on Bowling's credibility, which is a particular problem where the claimant alleges a mental impairment where the only means of diagnosis and evaluation might be the claimant's self-reported symptoms. (Tr. 44, 562)  *See Poulin v. Bowen*, 817 F.2d 865, 873 (D.C.Cir. 1987) ("[U]nlike a broken arm, a mind cannot be x-rayed . . . .").  The ALJ provided clear and convincing reasons for discounting Bowling's subjective testimony of disability.

Bowling further argues the ALJ failed to give appropriate weight to the opinion of the lay witnesses. (Tr. 18, pp. 19-21) Specifically, Bowling argues the ALJ improperly disregarded the opinion of the psychiatric nurse practitioner, Jane Ackerly.  (Tr. 18, p. 20) (citing (Tr. 764))

The testimony of a lay witness is "an important source of information about the clamant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness."  *Regennitter v. Commissioner of Social Sec. Admin*., 166 F.3d 1294, 1298 (9th Cir.1999).

In this case, the record contains a letter written in June of 2010 by Jane Ackerly summarizing Bowling's condition.  (Tr. 764)  Jane Ackerly is a psychiatric nurse practitioner who worked at La Frontera and was involved with Bowling's treatment.  In her letter, she stated that Bowling "has been unable to work due to psychiatric symptoms involving severe anxiety and panic."  *Id*.

The ALJ considered Ackerly's opinion but did not give it controlling weight.  (Tr. 45) He noted that as a nurse practitioner, Ackerly is not classified by the Social Security Administration as an "acceptable medical source" and therefore is not given the deference accorded to a physician or psychologist.  *See* 20 C.F.R. 404.1513, 416.913.  Nevertheless, "medical sources who are not acceptable medical sources, such as nurse practitioners" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Tippett v. Commissioner of Social*

*Sec.*, 2011 WL 6014015, 7 (D.Or. 2011) (quoting SSR 06-03p, at *3).  "Factors the ALJ should consider when determining the weight to give an opinion from these 'important' sources such as nurse practitioners include: The length of time the source has known the claimant and the number of times and frequency that the source has seen the claimant, the consistency of the source's opinion with other evidence in the record, the relevance of the source's opinion, the quality of the source's explanation of her opinion, and the source's training and expertise."  *Tippett v. Commissioner of Social Sec.*, 2011 WL 6014015, 7 (D.Or.2011) (quoting SSR 06-03p, at *4).

Here, the ALJ considered Ackerly's statement but did not give it controlling weight.  (Tr. 45)  He noted that a nurse practitioner is not considered an "acceptable medical source" by the Social Security regulations.  (Tr. 45)  Morever, he observed that her statement "appears to be based in large part upon the symptoms and limitations reported by the claimant rather than objective findings."  (Tr. 45)  And, the ALJ found Bowling's credibility to be suspect.  The ALJ cited to a portion of the record that documents Bowling's noncompliance in the past in support of his credibility findings.  (Tr. 45) (citing Tr. 638)  The ALJ's evaluation of the opinion of the nurse practitioner, Jane Ackerly, is legally sufficient and supported by substantial evidence.

Bowling further argues the ALJ erred when he found, based on the testimony of the vocational expert, that he was not disabled.  Bowling argues that his impairments are more severe than those proposed by the ALJ in the hypothetical he propounded to the vocational expert.

"At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy."  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  "At the hearing, the ALJ poses hypothetical questions to the vocational expert that set out all of the claimant's impairments for the vocational expert's consideration."  *Id.* (punctuation modified)  "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."  *Id*.  "The vocational expert then translates these factual scenarios into realistic job market probabilities by testifying on the record to what kinds

1    of jobs the claimant still can perform and whether there is a sufficient number of those jobs

2    available in the claimant's region or in several other regions of the economy to support a finding

3    of not disabled." *Id.* (punctuation modified)

4              Here, the ALJ propounded a hypothetical based primarily on the functional impairments

5    found by the non-examining physician, Randall J. Garland, Ph.D. The vocational expert

6    concluded a person with those functional impairments could work as a night office cleaner,

7    DOT # 323.687-014  (371,000 such jobs in the nation and approximately 8,100 such jobs in

8    Arizona), or as a landscape laborer, DOT # 406.687-010 (113, 000 such jobs in the nation and

9    approximately 3,700 such jobs in Arizona).  (Tr. 47) Accordingly, the ALJ concluded Bowling

10   was not disabled.  (Tr. 48)

11             Bowling argues that the medical record supports his allegations of more restrictive

12   functional impairments.  He argues the ALJ should have accepted his counsel's argument that

13   he would not be able to stay on-task at least five percent of the day and therefore is not able to

14   work.

15             The ALJ, however, "is not bound to accept as true the restrictions presented in a

16   hypothetical question propounded by a claimant's counsel." *Magallanes v. Bowen*, 881, F.2d

17   747, 756 (9th Cir. 1989).  "Rather, the ALJ is free to accept or reject these restrictions as long

18   as they are supported by substantial evidence." *Id.* at 756-57 (punctuation modified).  Here, the

19   ALJ accepted the functional limitations proposed by the non-examining physician rather than

20   those proposed by the claimant.  Substantial evidence supports his findings.  Accordingly, the

21   court finds the ALJ's finding of non-disability is supported by substantial evidence.  *See*

22   *Bayliss v. Barnhart*,  427 F.3d 1211, 1217-18 (9th Cir. 2005) (The ALJ's reliance on the

23   testimony of a vocational expert was proper where she was given a hypothetical that contained

24   all the limitations the ALJ found credible and supported by substantial evidence in the record.).

25             Finally, Bowling argues the determination of the ALJ is undermined by the additional

26   records he submitted to the Appeals Council.  Specifically, he references the evaluation

27   performed by Smith at the Disability Assessment Clinic in April of 2011 and the medical

28   records from his treatment at Palo Verde Hospital in June of 2011.

1    Bowling is correct that this court must consider records submitted to the Appeals Council

2 in analyzing whether or not the decision of the ALJ is supported by substantial evidence.

3 *Brewes v. Commissioner of Social Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]hen

4 the Appeals Council considers new evidence in deciding whether to review a decision of the

5 ALJ, that evidence becomes part of the administrative record, which the district court must

6 consider when reviewing the Commissioner's final decision for substantial evidence."). The

7 court does not agree, however, that the new evidence would have altered the ALJ's final

8 determination the Bowling is not disabled.

9    In April of 2011, Bowling was assessed at the Disability Assessment Research Clinic at

10 the Arizona Arthritis Center by David Wayne Smith, D.ED., DABPS, FACFEI. (Tr. 774-75)

11 Smith found Bowling to have a normal IQ in the middle of the average range. *Id*. He noted,

12 however, that Bowling had extremely poor short-term memory. *Id*. Smith concluded that

13 Bowling was "severely mentally ill." *Id*. He opined as follows: "This man would not be a

14 candidate for employment, in fact, he could be at risk in any job due to his memory and

15 concentration, as well as his auditory and visual hallucinations. I did not have a record of

16 psychiatric treatment, only the patient's record of his medications. I also have some concerns

17 as to whether he is capable of determining what medications to take and when. It would be in

18 his best interest to have a guardian appointed, including a person to manage any money he

19 receives from SSDI." *Id*.

20    This assessment provides additional support to Bowling's subjective testimony of

21 disability. It is unlikely, however, that it would have altered the ALJ's analysis. First, Smith

22 is neither a psychiatrist nor a psychologist. Accordingly, it does not appear that he qualifies as

23 an "acceptable medical source" and his opinions are not entitled to the same deference as those

24 relied upon by the ALJ here. Second, his opinions appear to be inconsistent with other aspects

25 of the record. Smith expresses skepticism that Bowling would be able to take his medication

26 without assistance, but Samantha Fierro stated that Bowling does not "need help or reminders

27 taking medicine." (Tr. 288) Third, Smith gave his opinion without having access to Bowling's

28

1  psychiatric treatment record.  Finally, Smith's assessment is based on Bowling's subjective

2  statements, which the ALJ finds are generally lacking in credibility.

3       The court further finds that Bowling's admission to Palo Verde Hospital in June of 2011

4  does not contradict the ALJ's finding.  That admission occurred some six months after the

5  ALJ's decision and was triggered by a "recent worsening" of Bowling's symptoms.  (Tr. 789)

6  Accordingly, those records shed little light on Bowling's condition at the time of the ALJ's

7  decision.

8

9       IT IS ORDERED that the Commissioner's final decision in this matter is AFFIRMED.

10  The Clerk of the Court is instructed to enter judgment accordingly and close this case.

11

12       DATED this 29th day of May, 2013.

13

14       _Leslie A. Bowman_

15            Leslie A. Bowman

16            United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28